Luis R. Morales
Reg. No. 95-A-3747
Woodbourne Correctional Facility
Prison Road, P.O. Box 1000
Woodbourne, New York 12788-1000

March 17, 2011

U.S. Court of Appeals
for the Second Circuit
40 Foley Square
New York, N.Y. 10007

Subj: **Initial Filing of Petition for Review**

Re:  **Morales v. Holder**
     File: A034-200-190 - Fishkill, N.Y.

Honorable Justices:

With all due respect, petitioner-appellant hereby, acting pro se, ask the Court to please treat and accept this missive as a timely filed Petition for Review submitted pursuant to 8 U.S.C. § 1252(b)(5), Moraves v. Holder, 351 Fed. Appx. 554, 2009 WL 3645321 (2d Cir. 2009); 8 U.S.C. § 1252(a)(2)(D), Pierre v. Gonzales, 502 F.3d 109, 113 (2d Cir. 2007), Poole v. Mukasey, 522 F.3d 259, 264 (2d Cir. 2008), where petitioner is seeking a de novo review of the Board of Immigration Appeals's decision and order rendered on March 3, 2011, denying a motion to reopen the removal proceeding in order to submit newly obtained evidences, eggregious errors and unique circumstances which had been filed pursuant to 8 C.F.R. § 1003.2(a), Guar v. Ashcroft, No. 012988, 65 Fed. Appx. 773, 77576 (3d Cir. Apr. 4, 2003).

2. Based on a prior ruling held by this Court in Morales v. Holder, supra, this Court retains subject matter jurisdiction to resolve constitutional claims or questions of law under 8 U.S.C. § 1252(a)(2)(D), Pierre v. Gonzales, supra, 502 F.3d 113; including whether petitioner has a valid claim to United States citizenship, see Section 242(b)(5)(A)&(B), Poole v. Mukasey, supra, 522 F.3d at 262.

3. Now, based on the undisputed facts of this case, and the nature of the newly obtained evidences as well as the unique circumstances that these evidences creates when combined with a prior finding of facts emitted by this Court in Morales v. Holder, supra, which establishes three exceptions to the physical presence requirement for purposes of demonstrating that petitioner derived United States citizenship from his father under former section 301(a)(7) (1952), petitioner respectfully asserts that the BIA's denial of the motion to reopen constitutes another abuse of discretion. See Kaur v. Board of Immigration, 413 F.3d 232, 233 (2d Cir. 2005).

General Background

To begin, in a prior Petition for Review, where petitioner had asked for review of the Board of Immigration Appeals's decision dated January 5, 2006, petitioner had had argued that, because he acquired United States citizenship from his

father at the time of his birth under 8 U.S.C. § 1401(a)(7) (1952), he is not removable as an aggravated felon under section 237(a)(2)(A)(iii) and (a)(2)(D) of the Immigration and Nationality Act ("INA").

2. On the other hand, this Court in a Summary Order rendered on November 5, 2009, made the following finding of facts in pertinent parts:

> Morales's mother was a citizen of the Dominican Republic. His father, however, was born in Puerto Rico on March 19, 1900, and presumably acquired United States citizenship in 1917 pursuant to the Jones Act, 39 Stat. 951 (1917) (codified at 8 U.S.C. § 1402). Morales submits that his father left Puerto Rico for the Dominican Republic in 1919 and did not return to the United States until after Morale's birth. Thus, assuming without deciding that presence in Puerto Rico between 1900 and the 1917 enactment of the Jones Act qualifies as presence in the United States under § 140[1](a)(7), the key question to be decided in this case is whether Morales adduced sufficient evidence of his father's presence in Puerto Rico through March 19, 1919, thereby satisfying the § 140[1](a)(7) requirement of five years' residence after attainment of the age of fourteen.
>
> Morales's evidence on this point consists principally of (1) a birth certificate showing that his father's birth was registered in Puerto Rico on February 10, 1919; and (2) a sworn affidavit, dated June 18, 1971, from his father, which claims that he left Puerto Rico the same year [1919]. Because nothing in the record suggests that a person must be physically present to register his birth, the certificate is not probative of Morales's father physical presence. Even if it were, the certificate demonstrates, at most, the father's physical presence in the United States only through February 10, 1919, whereas § 140[1](a)(7) would have required such presence through March 19, 1919. The father's affidavit <u>is</u> probative of his physical presence. Nevertheless, because it does not specify a **date of departure**, it too is insufficient to permit the finding of presence through March 19 necessary to support Morales's citizenship claim under § 140[1](a)(7).
>
> In sum, having failed to adduce sufficient evidence to demonstrate his father's physical presence in the United States through at least March 19, 1919, Morales has no claim to citizenship under 8 U.S.C. § 140[1](a)(7) and remains an alien. Accordingly, we lack jurisdiction to hear his challenge to removal and, therefore, order the petition for review DISMISSED.[3]

Please see <u>Morales v. Holder</u>, supra; see also footnote n.3.

3. First of all, while petitioner was awaiting for the above decision, he inadvertently had uncovered new information in reference to the "South Porto Rico Sugar Co.," which petitioner's father had cited in his June 18, 1971 affidavit as the company that in 1919 had had exported him to the Dominican Republic as a laborer to work in the Central Romana. For instance, while reading a book entitled: "A History of Latinos in America (Harvest of Empire)," written and published by the journalist Juan Gonzalez (Copyright in the year 200 in the U.S.), petitioner became aware of the following fact which is crucial

-2-

for "ground I" before the Court:

> Already a subsidiary of the **U.S.-owned South Porto Rico Sugar Company,** Central Romana would nearly quadruple in size to more than half a million acres by the 1960s and would later become one of the Caribbean pearls in the worldwide empire of the giant Gulf and Western Corporation, plant, Sugar and Modern Slavery, 14.

See A History of Latinos in America, Harvest of Empire, pg. 71, footnote no.32 (at pg. 287) (copyright 2000), see also U.S. Congressional Record, 64th Congress, 1st session, May 5, 1916.

4. In any event, following the Court's suggestions made under footnote no.3, petitioner settled in motion a number of FOIA/Pa requests with the federal government's agencies. And in a letter dated December 24, 2009, the U.S. State Department provided petitioner the address of the National Archives and Records Administration ("NARA"), for pre-1925 passport records, and visa records dating 1910-1940.

5. Well, to make a long story short; after five(5) FOIA/Pa requests, in a letter dated June 15, 2010, NARA replied: "I was able to find that Mr. Morales [petitioer's father] departed from the port of Guanica, Puerto Rico, on the S.S. Claremon, bound for La Romana, Dominican Republic, on **27 February 1919.**"

6. In other words, according to this new fact, petitioner's father departed from Puerto Rico seventeen(17) days after his mother had had registered him with the Demographic Department of Puerto Rico. Furthermore, this crucial fact also evinces that he had departed **"20 days"** before the required date estimated by this Court pursuant to the physical presence requirement of Section 1401(a)(7) (1952), so to speak, **March 19, 1919.**

7. In addition, NARA also provided an accurate copy of the "Passengers Manifest of the S.S. Claremont" from February 27, 1919, which has been obtained from the **"Microfilm A4106."** And, according to some of the INFO recorded in said document, (1) petitioner's father was 18 years-old and single; (2) recorded as a U.S. citizen as well as the others 22 passengers; (3) recorded as born in March 19, 1900, in the Town of Ensenada, Guanica, Puerto Rico; (4) recorded as a laborer as well as the others 22 passengers, and (5) recorded as having

no prior arrival or departure into and/or from the U.S. or P.R. as opposed to seven(7) of the others 22 laborers. See APPENDIX "C" of the motion to reopen, at pgs. 13-14 ("an affidavit dated July 4, 2010").

8. By the way, in a letter dated May 13, 2010, NARA had had provided petitioner a "doctoral dissertation" by Humberto Garcia-Muniz in reference to the early history of the **"South Porto Rico Sugar Company"** (The history of a U.S. Multinational Corporation in Puerto Rico and the Dominican Republic, 1900-1921). See a copy of said document submitted as APPENDIX "B" in the motion to reopen, at pg. 13.

9. As explained to the BIA, while petitioner concedes that the newly obtained evidence does not "directly" demonstrates that petitioner's father departed on or after March 19, 1919, the new evidence "at least" evinces the specific date that his father departed from Puerto Rico to the Dominican Republic, and corroborates the facts recorded in his father's birth certificate as well as the facts declared by his father in his affidavit of June 18, 1971, where he had declared that in 1919 he had had arrived into the Dominican Republic as a laborer (builder mechanic) sent by the South Porto Rican Sugar Company. The evidence also establishes the fact that his father never has had traveled overseas prior to his 1919 departure, which means tha his father had had resided within a U.S. outlying possession (Puerto Rico) for almost 19 complete years prior to his departure, and the difference is a 20-day's missing-gap which exists between February 27, 1919 and March 19, 1919.

10. Again, while the evidence directly does not establishes that his father satisfy the physical presence requirement of § 1401(a) (7), technically the evidence in the record and the unique circumstances presented in this particular case -as probative elements of the exceptions within § 1401(a) (7)- demonstrates that his father satisfy the physical presence requirement of § 1401(a) (7) and its exceptions as set forth within its **proviso**. See Drozd v. INS, 155 F.3d 81, 86 (2d Cir. 1998).

11. And, once again, following the Court's directions, based on the foregoing facts and circumstances, petitioner articulated three(3) solid grounds which are the corner stones of the motion to reopen that has been denied by the Board

of Immigration Appeals ("BIA"). The three grounds, which are essentially the same grounds that have been raised in this instant petition, are as follows:

### GROUND I

WHILE THE NEWLY OBTAINED EVIDENCE ESTABLISHES THAT PETITIONER'S FATHER DEPARTED FROM A U.S. INSULAR POSSESSION 20 DAYS BEFORE SATISFYING THE 10 YEARS OF PHYSICAL PRESENCE REQUIREMENT OF § 1401(a)(7) (1952), THE EVIDENCE ALSO ESTABLISHES AND CORROBORATE THE FACT THAT THE REASON HIS FATHER DEPARTED 20 DAYS EARLIER WAS TO WORK OVERSEAS FOR A U.S. MULTINATIONAL ORGANIZATION, AND THAT DURING SAID PERIOD OF TIME HIS FATHER WAS PHYSICALLY PRESENT WITHIN THE PERIMETERS ALLOWED BY ONE OF THE EXCEPTIONS OF THE **PROVISO** OF § 1401(a)(7) (1952), Drozd v. I.N.S., 155 F.3d 81, 86 (2d Cir. 1998).

### GROUND II

WHILE THE NEWLY OBTAINED EVIDENCE DEMONSTRATES THAT PETITIONER'S FATHER DEPARTED 20 DAYS EARLIER OVERSEAS AS AN EXPORTED LABORER FOR A U.S.-OWNED MULTINATIONAL ORGANIZATION, WHERE A SECONDARY EVIDENCE EVINCES THAT HE HAD WORKED FOR SEVEN(7) YEARS CONTINUOUSLY FROM 1919 THROUGH 1926, PETITIONER WOULD BE ABLE TO ESTABLISH THAT DURING FIVE(5) OF THOSE SEVEN(7) YEARS HIS FATHER WAS PHYSICALLY PRESENT WITHIN A TERRITORY OVER WHICH (DURING THE SAME PERIOD OF TIME) THE U.S. GOVERNMENT HAD EXERCISED COMPLETE SOVEREIGNTY BY MEAN OF ITS MILITARY'S OCCUPATION AND ITS MILITARY'S APPOINTED GOVERNORS; THEREFORE, DURING SAID PERIOD OF TIME, INCLUDING THE 20-DAYS" MISSING-GAP, HIS FATHER WAS PHYSICALLY PRESENT WITHIN A U.S. TEMPORARY OUTLYING POSSESSION WITHIN THE MEANING OF § 1401(a)(7) (1952).

### GROUND III

DESPITE THE FACT THAT PETITIONER'S FATHER DEPARTED 20 DAYS BEFORE SATISFYING THE 10 YEARS OF PHYSICAL PRESENCE REQUIRED BY § 1401(a)(7), WHERE THE INS RESOURCE GUIDE IN ALL ITS CHARTS TO DETERMINE WHETHER LEGITIMATE CHILDREN BORN OUTSIDE THE UNITED STATES ACQUIRED U.S. CITIZENSHIP AT BIRTH STATES: "ABSENCE OF LESS THAN **60 DAYS** IN THE AGGREGATE 'WILL NOT BREAK' CONTINUITY OF PHYSICAL PRESENCE;" THEREFORE, THE 20 DAYS' MISSING-GAP DID NOT BREAK THE CONTINUITY OF THE 10 YEARS OF PHYSICAL PRESENCE BECAUSE THE 20 DAYS' GAP HAS BEEN COVERED BY THE **60 DAYS** GRACE PERIOD OF TIME AFFORDED BY THE INS RESOURCE GUIDE.

Please see the supporting facts and supporting legal arguments of each of these grounds at pages 3-14 and 15-23, respectively, of the motion to reopen.

12. However, the main reasons by which the BIA denied the motion to reopen was because the motion was untimely filed and number-barred and has not been show to qualify for any exception to the filing requirements imposed on motions

to reopen removal proceedings (§ 3.2[c][2]). Under these circumstances, see Kaur v. Board of Immigration Appeals, 413 F.3d 232, 234 (2d Cir. 2005).

13. On the other hand, as to the merits of the grounds raised, based on conclusory statements --without addressing the probative weight of none of the evidence presented and after skipping ground two-- the BIA concluded that "the evidence submitted along with the respondent's present motion does not demonstrate an exception to the physical presence requirement for purposes of demonstrating that he derived United States citizenship from his father," citing former § 301(a)(7) (8 U.S.C. § 1401(a)(7)). See a copy of said decision submitted as **APPENDIX "A"** herein.

14. Based on the probative value of the evidence presented and the circumstances within each of the grounds, petitioner asserts that; contrary to the BIA finding, (1) the evidence and each of the circumstances presented in each of the grounds raised satisfy the physical presence requirement of § 1401(a)(7), (2) the evidence and circumstances presents a genuine issue of material fact about petitioner's nationality claim, and (3) petitioner asks for a de novo review of the BIA's decision. 8 U.S.C. § 1252(b)(5)(B), Agosto v. INS, 436 U.S. 748, 756, 98 S.Ct. 2081, 2087, 56 L.Ed.2d 677 (1978).

## Legal Arguments

1. First of all, according to this Court, a motion to reopen asks that the proceedings be reopen for new evidence and a new decision, usually after an evidentiary hearing. Such motions must state what the facts would be proven at a hearing and be supported by affidavits or other evidentiary material. See Kaur v. Board of Immigration Appeals, 413 F.3d 232, 234 (2d Cir. 2005). Similarly, the BIA regulations provide that "[a] motion to reopen proceedings shall not be granted unless it appears to the Board that the evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1) (2005).

2. Where the only issue preventing petitioner from been a U.S. citizen at birth is the 20-days' missing-gap on the physical presence requirement, the facts provided by the new evidence are crucial to the 20-days' missing-gap, which

means that, if proved and accepted as true, the offered evidence can fill the 20-days' missing-gap and change the result of the prior proceedings. If so, this also states that the offered evidence is material to the issues before the Court.

3. Similarly, as explained to the BIA in the verified affidavit, while the offered evidence was available during the prior proceedings, (1) petitioner had no idea that he was going to be in need of the offered evidence until this Court made the prior finding of facts; (2) one of the offered evidence was discovered inadvertently as petitioner was reading a book written by the journalist Juan Gonzalez; and (3), while the other evidence existed during the prior proceedings, (a) petitioner was not aware of the existence of said evidence, (b) he was not aware of the existence of the agency that had been in possession of the offered evidence, and (c) petitioner became aware of the existence of said agency after the State Department provided the name and address of said agency.

4. On the other hand, having the technology and direct access to the sources of the offered evidence, the U.S. Department of Justice is on a position to verified and/or to disproved the veracity of each of the offered evidence to support each of the grounds raised herein.

5. Moreover, while the Department of Homeland Security (DHS) submitted an opposition, they did not specifically address any of the issues presented. And, while addressing the merits of ground one, first the BIA concluded as follows:

> "While former section 301(a)(7) of the Act provides that a citizen parent's period(s) of employment with the United States government or with an international organization may be included in order to satisfy the physical presence requirement, that respondent's father was employed by a multinational apparently United States owned company does not demonstrate that the respondent's father was employed by the United States government."

See Appendix "A" herein ("BIA's Decision").

-7-

6. First of all, as stated before, the "DHS" had offered no evidence or advanced any substantial argument disproving the veracity of the offered evidences in support of ground one, evidences which demonstrates that petitioner's father --as well as 22 others U.S. citizens laborers-- was imported to "D.R." from "P.R." to work for the South Porto Rico Sugar Company and that this same company was owned by the United States Government.

7. Here, for instance, as has been explained in the motion to reopen, the same June 18, 1971 affidavit that was referred by this Court in the Summary Order of November 5, 2009, was submitted as part of Appendix "A" of the motion to reopen (see pg. 6). The fact of the matter is that in that same affidavit, which this Court already had categorized as "[t]he father's affidavit is probative of his physical presence," petitioner's father had declared, inter alia, that in **1919** was imported to D.R. by the South Porto Rico Sugar Company as a laborer where he worked as a buider mechanic until 1926 due to health problems.

8. Similarly, one of the newly acquired information which has been offered in support of ground one, which was obtained from a published book entitled "Harvest of Empire" (History of Latinos in America"), corrobotates the existence of said company and, at the same time, provides and establishes the fact that the company was a U.S.-owned company, and that the "Central Romana" was a subsidiary of the company. See pages 11-12 of the motion to reopen.

9. Therefore, contrary to the BIA's conclusory suggestion, petitioner's father worked for the South Porto Rico Sugar Company and; if he worked for aforesaid company, he worked for a U.S.-owned company ("United States Government"). Again, under these circumstances, petitioner respectfully submit that the burden of proof is on the "DHS" to disprove that the INFO provided by the journalist Juan Gonzalez is incorrect as opposed to the BIA's suggestion without any basic in fact in order to justify its denial. And that action constitutes an abuse of this discretion.

10. Moreover, contrary to the BIA's conclusion, the evidence in the record demonstrates that one of the exceptions in the "proviso" of subsection (7) of Section 1401(a) may be applied to the facts of this case. And that the

-8-

20-days' missing-gap should be treated as "constructive physical presence" covered by the seven(7) years period that petitioner's father worked overseas. See Drozd v. INS, supra, 155 F.3d at 86 (2d Cir. 1998).

11. In addition, assuming arguendo, that the South Porto Rico Sugar Company was not a U.S.-owned company, and instead was an international organization within the meaning of Section 1401(a)(7) and 22 U.S.C. § 288. Well, as a separated point to ground one, the BIA also concluded as follows:

> "Nor does the record contain any evidence indicating that such company was an international organization within the meaning of the International Organization Immunities Act, which only applies to international organizations in which the United States participated pursuant to a treaty or act of Congress. See 22 U.S.C. § 288; see also former section 301(a)(7) of the Act."

See Appendix "A" herein ("BIA's Decision").

12. Again, contrary to the BIA's summary statements, as Appendix "B" of the motion to reopen (pgs. 13, 17-18), petitioner submitted a "doctoral dissertation" written by Humberto Garcia-Muniz in reference to the early history of the South Porto Rico Sugar Company ("1900-1921"), which had been provided by NARA in a letter dated May 13, 2010. In fact, the letter has been submitted as part of Appendix "A" of the motion to reopen. In any event, the provided document contains the following information:

> "This dissertation studies the early history (1900-1921) of the South Porto Rico Sugar Company, a U.S. multinational corporation with sugar factories in Puerto Rico and the Dominican Republic. It explores in a competitive manner the corporation's establishement and expansion in two contries with dissimilar histories and realities. The central argument is that the corporation was successful because it combined German capital familiar with conditions in the U.S. marked and Puerto Rico, specialized Louisiana top/middle administrative/technical personnel in sugar processing, Barbadian biological technology and supervision in cane cultivation, and Caribbean labor, all under a competent New York-based management and board of directors, in countries controlled by the United States during propitious times for growth of the sugar industry. Other subjects deal with are the relationship of the Sugar Trust with South Porto Rico Sugar Company, the removal of German capital in the company and associated firms, the development of a sugar bourgeoisie in Puerto Rico, migration and labor instability, cane diseases, and 'land wars' and gavillerismo in the Dominican Republic."

See Appendix "B" of the motion to reopen; and NARA retrieved this document in May 13, 2010, from the Columbia University Labraries.

13. First, based on the predicate of the foregoing document, contrary to the BIA's findings, the record contains a material document devoted of the early history of the South Porto Rico Sugar Company, an account which establishes that the company was a multinational organization within the meaning of Section 1401(a)(7) and 22 U.S.C. § 288, which was operating within two countries controlled by the United States, all under a competent **"New York-based"** management and board of directors, which also includes operations in the State of Louisiana.

14. Now, although the document does not specifically address the issue of whether the company was operating internationally under any U.S. treaty or Act of Congress, the fact that the company was operating within three different countries suggests that the company was functioning under a trade or commercial treaty or an Act of Congress. The fact is that traditionally companies does not operates within different countries unless there is a treaty or a trade agreement signed between the countries in which the company or companies operates.

15. Similarly, it should be difficult for someone with knowledge, knowing how the internatial policies operates between countries, specially the United States commercial's policies, to accept as fact and conclude that a company with the magnitude of the South Porto Rico Sugar Company, with its principal management's office and its board of directors established in New York City, would be operating between three different countries without any type of international trade agreement or treaty signed between these countries.

16. Here, for instance, according to the history of the Dominican Republic, the New York-based Barahona Company, which was organized in 1916, the year of the beginning of the U.S. invasion, by 1925 it had amassed 49,400 acres, largely from buying communal holdings, and was the second-largest plantation in the country. The Central Romana mushroomed in size from 3,000 acres in 1912 to 155.000 acres in 1925. By 1924, twenty-one sugar companies controlled 438,000 acres -a quarter of the country's arable land. And more than 80 percent

of it belonged to twelve U.S. companies. As land for subsistance farming disminished, staples had to be imported from the United States and the prices of food skyrocked. See Harvest of Empire ("pg. 71"); Calder, The Impact of Intervention, 91-114, gives an excellent overview of land and sugar policy during the occupation, also U.S. Staged Elections in the Dominican Republic (Boston: South End Press, 1984).

17. The bottom-line here is that all these U.S. companies that were established and operating in the Dominican Republic between 1916 and 1924, including the South Porto Rico Sugar Company and the Gulf and Western Corporation, were in the country with the written and expressed consent of the United States Government because during this period of time the country was occupied by the United States. See ground two of the motion to reopen, which describes a general account of the U.S. occupation (pgs. 18-21).

18. Based on the foregoing evidence and explanations, petitioner respectfully submit that the South Porto Rico Sugar Company —as a multinational corporation operating within "three countries" controlled by the United States— was an international organization within the meaning of the proviso of § 1401(a)(7) and 22 U.S.C. § 288. And therefore, the proviso of § 1401(a)(7) may be applied to the unique circumstances presented within "ground one" of the motion to reopen, which mean that the 20-days' missing-gap should be exempted or covered by the seven(7) years period that his father worked overseas for the South Porto Rico Sugar Company.

## Ground II

1. Here, as has been well-established and developed in the motion to reopen (pgs. 18-21), petitioner asserts that during the 20-days' missing-gap his father was physically present within a territory over which the United States had complete sovereignty for eight(8) years (1916-1924). Under these circumstances, petitioner asserts that his father was physically present within a U.S. outlying possession under the full control of the United States within the meaning of § 1401(a)(7) (1952), and the 20-days' missing-gap may be exempted.

2. Here, for instance, in May 1916, President Woodrow Wilson sent the marines,

-11-

dissolved the legislature and imposed martial law. The occupation would last eight(8) long years. During the occupation, the U.S. Government, among other important things, construed a highway system; reformed the government's financial system; build hundreds of public schools; carried out successful public health campaigns against malaria, and intestinal diseases, and replaced the country army with a new U.S.-trained National Guard. Those changes left the country irreversibly dependent on the United States. In 1919, for instance, a customs law opened the country to "imports" by declaring 245 U.S. product duty-free. And one of the military **governor** assigned by Washington was Harry S. Knapp, who protested to the secretary of the navy in 1917 about the U.S. companies exploiting the country's natural resources. To make a long story short, in 1920 Republican Warren Harding captured the White House, and dispached Summer Welles to arrange a U.S. withdrawl from the Dominican Republic. However, it was not until 1924 that Walles finally arranged the withdrawl of the marines. See Harvest of Empire (pgs. 68-73); and the U.S. Congressional Record, 64th Congress, 1st session, May 5, 1916.

3. Now, by having complete sovereignty over the country's political affairs as well of its political institutions, the United States was controlling the will and political' affairs of the country as a temporary U.S. outlying possession within the meaning of § 1401(a)(7). And therefore, the 20-days's gap should be counted as constructive physical presence within a U.S. outlying possession in order to satisfy the five years of physical presence after attainment of the age of fourteen.

4. And, for purpose of clarification, petitioner is not suggesting by any mean that a person born in the Dominican Republic within the time frame in question become a U.S. citizen at birth within the meaning of Section 1401(a) (1952). Instead, the central argument here is that from February 28, 1919 through 1924 his father was physically present within a territory or country which the U.S. had complete sovereignty. For instance, see the language of § 1402(a).

Petitioner would like to add the fact that neither the Department of Homeland Security ("DHS") nor the Board of Immigration Appeals (BIA) addressed this issue. In fact, for unknown reasons, the BIA intentionally had skipped this crucial issue. Perhaps the "DHS" nor the "BIA" had a substantial excuse to

justify any possible denial.

### Ground III

1. In this ground petitioner asserted that, where this Court's finding of facts of November 5, 2009 (Summary Order), states that petitioner failed to adduce the required evidence indicating the specific date that his father departed and/or indicating that he departed at least on March 19, 1919, and where Appendix "C" of the motion to reopen (The Passenger Manifest) demonstrates that his father departed on February 27, 1919, petitioner concedes that he have a 20-days' gap to fulfill between February 27 and March 19, 1919.

2. However, according to the INS Resource Guide, in all its charts to determine whether ~~whether~~ legitimate children born abroad acquired United States Citizenship at birth, note (1) states: "Absence of less than **60 days** in the aggregate will not break continuity of physical presence for this purpose." See Appendix "D" of the motion to reopen (pgs. 22-23).

3. Here, based on these facts and circumstances, petitioner argued that, even though the current record demonstrates that his father left from Puerto Rico 20-days earlier than the time prescribed by this Court and § 1401(a)(7), the fact of the matter is that the **60 days** grace period afforded by the INS Resource Guide prevents the breaking of the continuity of the five years of physical presence requirement. And that the fact that his father had stayed overseas over the 60 days --working a U.S.-owned corporation and/or multinational organization-- is irrelevant because out of the 60 days he only needed 20 days to satisfy the five years requirement of § 1401(a)(7).

4. At the other end of the spectrum, instead of addressing ground two, the BIA turned the corner and concluded: "Nor, as the respondent concedes, was his father absent for a period of less than 60 days, which might have been considered in calculating the continuity of his father's period of physical presence." See APPENDIX "A" herein.

5. However, petitioner disagree with the BIA's conclusion for several reasons. Here, according to the information recorded in Appendix "C" of the motion to

-13-

reopen, his father never left the country prior to his February 27, 1919 departure. Consequently, although his father over stayed for more than 60 days, the fact of the matter is that by the time the 60 days expired his father already had satisfied the five years of physical presence. In other words, to be more specific; because he only need twenty-days, in March 20, 1919 his father already had satisfied the five-years's physical presence requirement, and the 60 days had expired in April 29, 1919, 40 days after he had satisfied the requirement.

6. Then again, the BIA's opinion would only apply in a particular situation where the individual is facing a missing-gap over the 60 days (for instance, 65 days), and he had stayed overseas for more than the 60 days grace period. This says that the BIA has misinterpreted the meaning and purpose of the INS Resource Guide and, consequently, the BIA had applied the wrong interpretation to the wrong set of facts.

7. Therefore, under the INS policy and procedure, petitioner respecfully submit that his father satisfy the physical presence requirement, and that under the Due Process Clause petitioner should be entitled to a Certificate of Citizenship ("§ 1401[a][7] [1952] and U.S. Const. XIV Amedt.").

8. In alternative, since the circumstances within each of these issues manifest a genuine issue of material fact regarding petitioner's nationality, petitioner respectfully asks for an evidentiary hearing on this paramount matter.

9. Here, for instance, in Ayala-Villanueva v. Holder, 572 F.3d 736 (9th Cir. 2009), the Ninth Circuit transfered a petition to the district court pursuant to 8 U.S.C. § 1252(b)(5) based on a genuine question of material fact concerning petitioner's nationality. In that case, the court emphasized that "[t]raditional summary judgment rules guide our decision" to transfer under § 1252(b)(5), and that "[w]here the evidence presented in support of [a] claim would be sufficient to entitle a litigant to a trial were such evidence presented in opposition to a motion for summary judgment, transfer for de novo determination of the citizenship claim is statutory mandated." Id. at 738.

## CONCLUSION

Based on the unique circumstances within each of the foregoing grounds, petitioner respectfully asks and prays that the requested relief in each of them be granted. In alternative, that an evidentiary hearing be granted with further instructions as the Court deems proper, and for such otther and further relief as this Court may deems just and equitable.

Dated:   March 22, 2011
        Woodbourne County, N.Y.

Respectfully submitted,

LUIS R. MORALES #95-A-3747
Petitioner's pro-se
99 Prison Road, Box 1000
Woodbourne, N.Y. 12788-1000



U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

Appendix "A"

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

| | |
|---|---|
| **\*S-MORALES-SANTANA, LUIS RAMON**<br>**INMATE #: 95-A-3747/A#034-200-190**<br>**INMATE HOUSING: GHN**<br>**PO BOX 1186**<br>**MORAVIA, NY 13118-0000** | **DHS/ICE Office of Chief Counsel - SIN**<br>**P.O. Box 606**<br>**Castle Point, NY 12511** |

**Name: \*S-MORALES-SANTANA, LUIS RAMON**          **A034-200-190**

**Date of this notice: 3/3/2011**

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

Enclosure

Panel Members:
    Miller, Neil P.

**U.S. Department of Justice**  
Executive Office for Immigration Review

Decision of the Board of Immigration Appeals

Falls Church, Virginia 22041

---

File:   A034 200 190 - Fishkill, NY    Date:    MAR - 3 2011

In re: LUIS RAMON MORALES-SANTANA a.k.a. Luis Morales

IN REMOVAL PROCEEDINGS

MOTION

ON BEHALF OF RESPONDENT:   Pro se

ON BEHALF OF DHS:   Laura A. Michalec  
Assistant Chief Counsel

APPLICATION:  Reopening

ORDER:

The respondent's motion is untimely filed and number-barred and has not been shown to qualify for any exception to the filing requirements imposed on motions to reopen removal proceedings. *See* sections 240(c)(7)(A), (C)(i) of the Immigration and Nationality Act, 8 U.S.C. §§ 1229a(c)(7)(A), (C)(i); 8 C.F.R. § 1003.2(c)(2). Moreover, the evidence submitted along with the respondent's present motion does not demonstrate an exception to the physical presence requirement for purposes of demonstrating that he derived United States citizenship from his father. *See* former section 301(a)(7) of the Immigration and Nationality Act, 8 U.S.C. § 1401(a)(7). While former section 301(a)(7) of the Act provides that a citizen parent's period(s) of employment with the United States government or with an international organization may be included in order to satisfy the physical presence requirement, that the respondent's father was employed by a multinational apparently United States owned company does not demonstrate that the respondent's father was employed by the United States government. Nor does the record contain any evidence indicating that such company was an international organization within the meaning of the International Organizations Immunities Act, which only applies to international organizations in which the United States participated pursuant to a treaty or act of Congress. *See* 22 U.S.C. § 288; *see also* former section 301(a)(7) of the Act. Nor, as the respondent concedes, was his father absent for a period of less than 60 days, which might have been considered in calculating the continuity of his father's period of physical presence. Consequently, the respondent cannot satisfy the physical presence requirement for purposes of demonstrating that he derived citizenship from his father.

On this record, the respondent has not provided us with an adequate reason to overlook the fact that his motion is untimely and number-barred. Accordingly, the respondent's motion is denied.[1]

FOR THE BOARD

---

[1] However, the respondent's appellate fee waiver request is granted. *See* 8 C.F.R. § 1003.8(a)(3).

## Affidavit of Service

**State of New York** )
                           sss
**Woodbourne County** )

    I, LUIS R. MORALES, being duly sworn, pursuant to 28 U.S.C. § 1746, deposes and says:

    That, on the 29 day of March, 2011, I served the clerk's office of the U.S. Court of Appeals, for the Second Circuit, the original of a Petition for Review dated March 22, 2011, including a copy of Appendix "A" of said petition, and a Notice of Motion and supporting affidavit requesting leave to proceed in forma pauperis.

    2. That, aforesaid documents, were deposited in a manila envelop and deposited in the facility U.S. Postal Service Box, to be delivery at the following address:

U.S. Court of Appeals
Clerk's Office
40 Foley Square
New York, New York 10007

    3. That, the foregoing envelop was post marked and served as First Class Prepaid Legal Mail.

Dated: March 22, 2011
       Woodbourne County, N.Y.

Respectfully submitted,

LUIS R. MORALES #95-A-3747
Petitioner's pro-se
Woodbourne Corr. Fac.
99 Prison Road, Box 1000
Woodbourne, N.Y. 12788-1000

DOROTHY DAVIS
Notary Public, State of New York
No. 01DA6215127
Qualified in Sullivan County
Commission Expires December 21, 20__

Sworn to before me this

24 day of March, 2011

*Dorothy Davis*
XXXXX NOTARY PUBLIC XXXXX

Luis N
Reg. N
Woodbourne Correctional Facility
99 Prison Road, P.O. Box 1000
Woodbourne, New York 12788-1000

First Class Prepaid Legal Mail



To: U.S. Court of Appeals
Clerk's Office
40 Foley Square
New York, N.Y. 10007

LEGAL MAIL ONLY



Luis R. Morales #95A3744
Woodbourne Correctional Facility
99 Prison Road, P.O. Box 1000
Woodbourne, N.Y. 12788-1000

LEGAL MAIL ONLY